THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELA CAPILLI                               :        CIVIL ACTION
                                          :
        v.                                :
                                          :
NICOMATIC L.P. and                        :
NICOMATIC, INC.                           :        NO. 07-3897

ORDER AND OPINION

JACOB P.  HART                              DATE:   September 8, 2008
UNITED STATES MAGISTRATE JUDGE

I.      Introduction

        Ela Capilli has sued her employer, Nicomatic L.P., and the related Nicomatic, Inc.,

("Nicomatic"), under Title VII of the Civil Rights Act of 1964, and under 42 U.S.C. § 1981, for

employment discrimination based on her sex and national origin (she is from the Philippines).

She maintains that Nicomatic created a hostile work environment, and then retaliated against her

after she complained to management about the discrimination.

        Nicomatic has filed a motion for summary judgment, to which Capilli has responded.  As

explained below, I will grant Nicomatic's motion in large part, but deny it as it relates to

retaliatory statements allegedly made by David Fisher, Nicomatic's president and owner.

II.     Factual Background

        Nicomatic is a business engaged in the manufacture of high-end electronic connectors for

use in electronics products.  Declaration of David Fisher, president and owner of Nicomatic,

attached as Exhibit C to Summary Judgment Motion ("Motion") at ¶ 1.  Capilli was hired as a

production worker in  November, 2003.  Deposition of Ela Capilli, attached as Exhibit A to

Capilli's Response ("Response") at 17.  She continues to work for Nicomatic.  Complaint at ¶ 13.

A.     The Post-It Note Incident

One day in April or May of 2006, a white male co-employee, Jonathan Park, gave Capilli a yellow Post-It note with "$10 Me Love You Long Time" written on it.  Capilli Deposition at 31-33.  According to Capilli, he stuck the note on her back.  Id.  Park denies placing the note on Capilli's back, but concedes that he wrote it and gave it to her and to Supang Hill, another Asian woman production worker.  Deposition of Jonathan Michael Park, attached as Exhibit F to Response at 16-17.

According to Park, this incident took place in a joking atmosphere.  Id.  However, a few days afterward, Capilli's boyfriend called Park at home and told him that Capilli had been offended by the note.  Id. at 22, 32.  Park approached Capilli at work the next day, and an argument ensued.  Id. at 23.

After arguing with Park, Capilli approached Dean High, Nicomatic's production manager and spoke to him in a conference room.  Capilli Deposition at 37-40, 45-47; Deposition of Dean High, attached as Exhibit D to Response, at 21.  Capilli and High agree that she told him that Park had written the Post-It note, and that she was upset about it.  Capilli Deposition at 37-40; High Deposition at 21-25.  They agree that High told Capilli he would talk to Park, and that he summoned Park to the conference room after Capilli returned to the assembly floor.  Capilli Deposition at 39-40.  High Deposition at 25.

Capilli maintains that she showed the actual Post-It note to High, and that he threw it in the trashcan, although she retrieved it.  Capilli Deposition at 38.  At his deposition, however, High denied knowing much about the note:  "Then she went on and said something about a Post-it note and the $10.00.  That's all I know about the note.  She did mention the $10.00.  Then I

didn't quite get what she was getting at about Jon had this note, you know."  High Deposition at 21.  He denied that he saw the note or threw it away.  Id. at 36.

High testified:  "So I went and talked to Jon and I got his side of the story, which was everyone was kidding around or whatever and they had this note, they were passing it around."  Id. at 25.  High decided to try to mediate the situation with the two parties in the conference room.  Id. at 25-26.  Capilli did not want to participate in this.  She testified at her deposition:  "I said there is nothing to talk about with him ... I filed a complaint to Dean.  That is Dean's job to talk to him, not Jon to talk to me."  Capilli Deposition at 46-47.  High told Park:  "Look, Ela doesn't want to talk to you, stay away from her, leave her alone and don't bother her."  High Deposition at 26.

It is not clear, whether High actually talked about the Post-It note with Park.  As above, High stated that Park said "they had this note."  However, when asked:  "Did you talk about the Post-It note at all?"  he replied:  "I can't really tell you that, I don't remember."  High Deposition at 28.  Park testified at his deposition that High spoke to him about Capilli being upset, but did not mention the Post-It note.  Park Deposition at 29-30.  High did not  report the incident to Fisher, and Park received no discipline.  High Deposition at 32, 35.

Capilli does not claim that Park ever said or did anything else to her which was discriminatory on the basis of sex, race or national origin.  Capilli Deposition at 50-51.

In early January, 2007, Fisher called Capilli into his office and gave her a written warning for talking on her cell phone on the assembly floor.  Deposition of David F. Fisher, Jr., attached as Exhibit B to Response, at 69; Capilli Deposition at 59.  At that time, Capilli told Fisher that Park had sexually harassed her by placing an offensive note on her back.  Id. at 65-67.  According to Capilli, Fisher called her a liar.  Capilli Deposition at 63.

3

Fisher testified at his deposition that he called Park into his office and asked him about Capilli's complaint.  Fisher Deposition at 73-74.  Park denied having spoken to Capilli, but Fisher testified that he believed there was some confusion because neither he nor Park realized that Capilli was referring to an incident that took place some ten months earlier.  Id. at 74-75.  When Fisher called Capilli back into his office for a second conversation, this became clear.  Id. at 74-75.  Capilli told him that the incident took place prior to May 1, 2006, and that she had reported it to Dean High.  Id.  87.

According to notes prepared by Fisher either on January 10, 2007, the day of the incident, or the day after, he spoke to Park again "to tell him this was something that happened in the old building" and Park "said he remembered the argument but ha[d] not spoken to her since."  Ela Capilli Incident Report, attached to Response as Exhibit G; Fisher Deposition at 81-82.  Fisher also wrote:  "I asked [Capilli] to submit a written claim detailing what she could and citing anyone that witnessed the event and any evidence she had.  She said she would."  Ela Capilli Incident Report, supra.

On January 11, 2007, Capilli submitted to Fisher a photocopy of the Post-It note, accompanied by a note in capital letters stating:

> This is a photocopy of a sticky note that a Nicomatic employee, John, stuck on my back to say that I am a whore!!  It was reported to Dean 7 months ago, and nothing was done, and I told Dave (the owner of this company) about it yesterday Jan. 9th and he said I was lying, this note as you can see is in John's own handwriting, and Supang is a witness to it.  How much longer are we going to tolerate these unfair work practices?  One person gets in trouble for something but another person does the same thing and gets in no trouble!!  The next page is a copy of a letter that my attorney asked me to write explaining what's going on so we may take action [.]

Capilli Packet, attached to Response as Exhibit H.  (Spelling errors corrected).

4

As described, Capilli attached to this page a one-page letter without a heading, stating in

part:

> I am writing this letter to explain a little bit more of the Discrimination that is
> going on where I work, Nico-matic.  Plain and simple, I have many incidents
> documented and witnesses.  Just a few weeks ago, and today is Jan. 10th, Just a
> few weeks ago [*sic.*] I received a written warning from the owner of the company
> Dave Fisher, for using my cell phone during work time to take an emergency call
> from my child's school about her being sick. ... Now on that very moment when I
> was given my written warning I pointed out to the owner that John had not had his
> goggles on and that is also a written warning, the owner looked at John saw no
> goggles and did not say anything or give him any type of written or verbal
> warning.  Is it because I am Asian and John is white?  I want to know this.
> Because also 7 months ago I reported John for sticking a sticky note on my back
> stating that I was a 10$ whore (which employee Supang saw and was there), I
> reported this to Dean the supervisor, who tried to throw the note in the trash, I
> retrieved the note from the trash and asked that it be brought to Dave's attention.
> I was in Dave's office yesterday Jan. 9th to review my written warning and told
> him about the incident and he said I was a liar and had no proof and Dean, the
> supervisor had not told him anything of this.  Again is this discrimination?

Exhibit H, supra.

Capilli went on in the letter to describe incidents involving other Nicomatic employees

who she said were harassed on the basis of sex and national origin.  Id.  She concluded:  "This is

just the tip of the iceberg and we will talk more regarding a possible class action

discrimination/sexual harassment case against the owner Dave Fisher if he does not change his

practices."  Id.

5

On the same day, January 11, 2007, David Fisher took the following statement over the phone from Park:

> Ela and Sue were joking about $10 this and $10 that, nothing sexual, just joking about it.  I (Jon) wrote a note and it said what she says it did in her note.  I handed it to both Ela and Sue and they were laughing about it.  I do not remember putting it on her back or an anyone's back.  After that I do not know what happened to the note.  Nothing else happened that day.  A few days later, she told me that this note offended her.  I told her that I did not mean anything by it and you were laughing about it at the time, so what are you talking about.  We then yelled back and forth at each other, but I do not remember what was said.  Dean later told me to stay away from her and I offered to go to her and apologize, but Dean said Ela did not want to talk to me.  I have not had any contact with her since then and have acted like she does not exist.

Statement from Jon Park, 1/11/2007, attached to Motion as Exhibit F.

Fisher also obtained a statement from Supang Hill on January 11, 2007.  Statement from Supang Hill, attached to Motion as Exhibit I.  Hill denied that the Post-It note said '$10 me love you long time' and said:  "John was joking around and Ela was not upset about the note until a few days later."  Id.

On January 16, 2007, Fisher issued the following Employee Warning Notice to Park:  "John was joking with Ela and Supang back and forth and at one point he wrote a note that said '$10 me love you long time.'  The incident occurred over seven months ago and there have apparently been no further incidents between these employees.  There have been no prior incidents of this sort with John."  Employee Warning Notice, attached to Motion as Exhibit J.  In the space for "Action to be taken", Fisher checked off:  "Warning" (other options were probation, suspension, dismissal or "other.").  Id.   In a blank space after "Consequence should behavior continue or the incident occur again", Fisher typed in:  "Further violations may result in suspension or termination."  Id.

On the same day, Fisher wrote the following letter to Capilli, on Nicomatic letterhead:

Dear Ela Capilli,

Thank you for providing the written statement of your claim of harassment.  The company has investigated this incident by interviewing and taking written statements from the witnesses you mentioned in your statement and others who were identified or subsequently came forward as witnesses to the event in question.

Based on the results of this investigation, we have taken corrective action that we believe will prevent further incidents.  We are striving for a pleasant work environment for all of our employees and will not tolerate harassment of any type.

You are a valued employee and we appreciate comments on the company and what we can improve.  If you encounter any further problems, please report them promptly to Dean High, the Production Manager or directly to me if you feel the issue is not handled properly or promptly for any reason.

Fisher Letter of January 16th, 2007, attached to Motion as Exhibit K.

On January 26, 2007, Capilli filed a Charge of Discrimination with the EEOC.  Charge of Discrimination, attached to Response as Exhibit K.  In it, she alleged discrimination on the basis of sex, race and national origin, as well as retaliation and sexual harassment.  Id.

B.    Alleged Retaliation

1.    Selective Discipline

Capilli maintains that after she complained to Fisher about the Post-It incident, and filed her EEOC charge, she was subjected to selective discipline in retaliation.  She points out that in her first three years at Nicomatic she received only two written warnings, whereas after her discrimination complaint, she was issued three written warnings in five months.

First, and most complex, is an incident which took place on March 21, 2007, for which Capilli received the following Employee Warning Notice:

> Ela argued with another employee and also made threats to this employee,
> allegedly with a taser or stun gun.  She has denied that she argued with this
> employee, made a threat, or has a taser, but her account is disputed by numerous
> witnesses to the incident who saw her argue with and verbally threaten the other
> employee.  Not a single witness confirmed her version of the events.

March 21, 2007, Employee Warning Notice, attached to Response as Exhibit N.

Apparently, the March 21, 2007, incident began when Capilli drove past several co-workers in the parking lot on a rainy day, and they believed she intentionally splashed water on them.  Fisher Deposition at 174-175; Park Deposition at 45.  One of these co-workers, Iris Murphy, made a rude hand gesture toward Capilli when she came in from the parking lot.  Capilli Deposition at 117-119; Park Deposition at 74-75.  This led to a face-to-face argument between Capilli and Murphy.  Fisher Deposition at 175.  Jim Strausbaugh, another Nicomatic employee, came forward to support Capilli, and, according to Park, "got right in Iris's face."  Park Deposition at 75.  Park then came forward to support Murphy.  Id. at 78; Strausbaugh Notes, attached to Response as Exhibit L.

According to Strausbaugh, "Ela stated that she wasn't afraid of Iris and raised and quickly lowered her right arm to show what appeared to be a cell phone.  Ela's hand was cupped and it happened so fast that all I saw was some silver blur."  Strausbaugh Notes, supra.  Dean High was present, but did not intervene.  Park Deposition. at 75, 79.  Park testified as his deposition that other employees pulled him away from the confrontation, and they went to the cafeteria to "cool off."  Id. at 76.

Later that day, when Fisher arrived, Capilli, Park and Murphy were all sent home for the day.  Capilli Deposition at 119.  Capilli, Park, Murphy and Strausbaugh all received written warnings.  Employee Warning Notices, attached to Defendants' Reply as Exhibit B.  Iris Murphy's warning stated that she made "inappropriate gestures to another employee, which

8

resulted in a verbal argument."  Id.  Murphy checked off that she agreed with that statement.  Id.
Park's and Strausbaugh's warnings both said that they "argued with an employee in a manner
that was inappropriate in the workplace."  Id.

On March 27, 2007, Capilli filed a Grievance Request Form stating:  "I was given the
middle finger several times by Iris in front of Dean a witness and in front of Jim a witness and
Dean is a supervisor and did nothing I have a written statement from Jim."  Grievance, attached
to Motion as Exhibit O.  Capilli's "proposed solution" was "proper discipline."  Id.  It is not clear
what, if any, action occurred as a result of this grievance.

The second disciplinary action which Capilli calls retaliatory was a warning notice for an
attendance problem.  Employee Warning Notice of April 27, 2007, attached to Response as
Exhibit N.  Nicomatic, however, has provided evidence that at least seven other Nicomatic
employees received discipline for attendance issues between October, 2006, and March, 2008.
Employee Warning Notices and Performance Appraisal and Warnings forms, attached to Motion
as Exhibit M.  None of these other individuals, including Jon Park, has been identified as Asian,
or appears to have an Asian name.  Id.  (Capilli was suspended for three days because of
attendance problems on December 28, 2007, but so were three other employees, including Park;
presumably this reflects the difficulty of maintaining attendance Christmas week).

Finally, Capilli points to an Employee Warning Notice she received on July 10, 2007.
This notice was for "inappropriate behavior" and stated:

> Nicomatic has clearly stated over the past months that we will not tolerate
> inappropriate behavior with respect to other employees and/or property.  Ela
> called another employee a "Bitch" and entered into an argument with another
> employee's guest.  We do not feel this is acceptable behavior.

Employee Warning Notice of July 10, 2007, attached to Response as Exhibit N.

Angie Acuna also received an Employee Warning in connection with this occurrence, for "inappropriate behavior of a guest".  Employee Warning Notice attached to Defendants' Response as Exhibit B.  Her's stated:

> Nicomatic has clearly stated over the past months that we will not tolerate inappropriate behavior with respect to other employees and/or property.  Angie had a guest on the property who entered into an argument with another employee and she is being held responsible for the guest's behavior.

Id.  According to Capilli, this guest was Acuna's boyfriend, and the interaction occurred in the Nicomatic parking lot.  Capilli Deposition at 102-105.  According to her, the boyfriend called her a bitch.  Id. at 103.

In order to demonstrate that her discipline was excessive, Capilli kept a journal of observed infractions of company rules by her co-workers.  Id. at 66.  According to diary pages which were produced in discovery, gum-chewing accounted for the vast majority of infractions, which also included such other things as eating, wearing slippers, failing to wear safety goggles, and absences from work.  Diary Pages, attached to Motion as Exhibit L.  Id.  On three occasions, Capilli reported gum-chewing or failure to wear goggles to management.  Id., at entries for April 18, 2007, May 13, 2007, and February 28, 2008.

2.    Co-worker Comments

Capilli also maintains that retaliation took the form of co-worker comments.  She testified that Park and Acuna sat at a cafeteria table looking at her, and laughing to each other.  Capilli Deposition at 95-99.  They reportedly said:  "boo ha-ha."  Id.  (The deposing attorney had a lot of trouble comprehending this remark, but the undersigned believes it may have been a sort of "evil laugh", possibly more like "bwa-ha-ha!").  Capilli also testified that Santa, Acuna's mother, who

also works at Nicomatic, muttered things when Capilli walked by, such as that she was "crazy." Id. at 156-157.

Further, Kris Skillman, a former Nicomatic employee, allegedly said that Capilli was always starting trouble.  Id. at 108-109.  Capilli also testified that Wendy Grendahl would give her dirty looks, and remarked that Capilli "was on everyone's shit list."  Id. at 120, 145-146.

Other than the March 27, 2007, grievance about Murphy having made rude hand gestures, which appears to related solely to the March 21, 2007, incident, Capilli did not report this allegedly retaliatory co-worker behavior to the company.  Id. at 171-172.

3.      Supervisor Comments

Capilli also relies upon evidence provided by Strausbaugh that David Fisher made disparaging remarks about her.  In an affidavit, Strausbaugh has represented:

> After I learned that Ms. Capilli complained about sexual harassment and discrimination to Defendants' management, I was told by Defendants' management that Ms. Capilli caused much trouble in the workplace.
>
> I was also told by David Fisher, Defendant's owner, that Ms. Capilli was the reason for a majority of the problems in the workplace.
>
> Mr. Fisher also informed me that Ms. Capilli was lying through her teeth and that she was "half-nuts" and during this conversation, Mr. Fisher was visibly agitated.

Affidavit of James Strausbaugh, attached to Response as Exhibit J.

According to a statement prepared by Strausbaugh, which he gave to Capilli, all of Fisher's statements about Capilli were made during "3 conversations in his office (around 9AM, 9:10AM and 10:45AM)" on the day that Capilli and Murphy had their altercation in March, 2007 (Strausbaugh identifies the date as March 20, although other sources have said it took place on March 21).  Strausbaugh Statement, attached to Motion as Exhibit L.  In that statement,

11

Strausbaugh quotes Fisher as saying:  "John told me that the reason he was after you was because he thought you were going to hurt Iris.  Which to me is crazy.  Frankly, I think they are all half nuts."  Id.  Thus it differs from his later representation that Fisher specifically identified Capilli as half-nuts.

Capilli also identifies as retaliatory an incident where she was in Fisher's office discussing a written discipline, and Fisher allegedly told her that if she wasn't happy at Nicomatic she should quit.  Capilli Deposition at 136-137.

III.    Relevant Legal Standards

A.     Summary Judgment

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp.. v. Catrett, 477 U.S. 317, 323 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party.  Anderson v. Liberty Lobby, supra at 255;  Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett at 323.

12

B.      Title VII and § 1981

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual on the basis of the individual's race, color, religion, sex or national origin.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993), quoting 42 U.S.C. § 2000e-2(a)(1).  When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment, a hostile work environment exists in violation of Title VII.  Id.

In order to state a *prima facie* claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that (1) she suffered intentional discrimination because of her protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis exists for employer liability.  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007), combined with Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), rev'd in part by Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006).[1]

---

[1]In Jensen, a retaliation case, the Court of Appeals for the Third Circuit wrote:  "We have often stated that discriminatory harassment must be "pervasive and regular."  See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995); Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).  But the Supreme Court's standard is "severe *or* pervasive."  Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct. 242, 159 L.Ed. 204 (2004) (emphasis added); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); Harris [v. Forklift Systems], 510 U.S. at 21, 114 S.Ct. 367; Meritor [Savings Bank, FSB v. Vinson], 477 U.S. [57at] 67, 106 S.Ct. [2299 at] 2399.  The difference is meaningful, and the Supreme Court's word controls, so we use the severe or pervasive standard here.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[I]solated incidents (*unless extremely serious*) will not amount to discriminatory changes in the terms and conditions of employment.") (emphasis added, internal quotation omitted); *see also* 2 Charles A. Sullivan, Michael J. Zimmer & Rebecca Hanner White, *Employment Discrimination Law and Practice* 455 (3d ed. 2002) ("The disjunctive phrasing means that 'severity' and pervasiveness' are alternative possibilities; some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.")."  435 F.3d at 449, n. 3.

Title VII also includes an antiretaliation provision, which forbids employer actions that discriminate against an employee because he has opposed a practice forbidden by Title VII. Burlington Northern & Santa Fe Railway Co. v. White, supra, at 548 U.S. 59.  To establish a *prima facie* retaliation case, a plaintiff must show (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.  Marra v. Philadelphia Housing Authority, 497 F.3d 286, 300 (3d Cir. 2007).

The United States Supreme Court explained in Burlington Northern, supra, that the adverse action by the employer need not be limited to "ultimate employment decisions", or even to action taking place at the workplace.  It need not be severe or pervasive enough to show a hostile work environment.  See Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006). Rather, it is enough if the employer action is that which a reasonable employee would have found to be "materially adverse", i.e., if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68.

Co-worker harassment is actionable as retaliatory only where supervisors knew or should have known about it but failed to take prompt and adequate remedial action to stop the abuse. Moore, supra, at 461 F.3d 349.

---

This is no longer the standard for a hostile work environment in a retaliation case, as I will discuss further below.  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53.  The "severe *or* pervasive" standard has, however, been followed by District Courts in this Circuit in other Post-Jenson civil rights cases.  See Neeley v. U.S Postal Service, Civ. A. No. 03-6566, 2007 WL 4389473 at *10 (E.D. Pa. Dec. 12, 2007) (sexual harassment); Sterling v. McKesson Automation, Inc., Civ. A. No. 02:04cv1470, 2006 WL 2792203 at *9 and n. 9 (W.D. Pa. Sep. 26, 2006) (age-based harassment under the ADEA); Maurizio v. Fox Chapel Foods, Inc., Civ. A. No. 02:04cv1168, 2006 WL 2571397 at *8 and n. 8 (W.D. Pa. Jun. 2, 2006).  Nevertheless, in Andreoli v. Gates, supra, the Court of Appeals once again applied the "pervasive *and* regular" standard with no discussion, even though it elsewhere cited Jenson on other points.  482 F.3d at 643, 644.  Thus, the exact parameters of Jenson are not clear.  As this is a summary judgment motion, however, I will apply the "severe *or* pervasive" standard, as it is more lenient to the plaintiff.

Claims under § 1981 are analyzed under the same framework as those brought under Title VII.  Patterson v. McLean Credit Union.  491 U.S. 164, 186 (1989).

IV.   Discussion

A.   Capilli Will Not Be Able to Show Hostile Work Environment Discrimination

The Post-It note Jon Park gave to Capilli was sexually and racially offensive.  "Me love you long time" is part of the quote "Me so horny, me love you long time" from the 1987 Viet Nam war movie Full Metal Jacket, spoken by a character identified as "De Nang Hooker." Http://en.wikipedia/org/wiki/Full_Metal_Jacket (August 18, 2008).  The quote has entered the public consciousness to such an extent that many people who cannot identify the movie it comes from still know that it is a line spoken not only by a prostitute, but by one who is specifically Asian.  Park almost certainly knew of the quote in this context.

This is my conclusion despite Park's attempt to explain at his deposition that the note meant that, if Capilli were to give him $10, he would feel affectionately toward her for a long time.  Park Deposition at 25, 81.  Notwithstanding the patent offensiveness of Park's note, however, the incident was not sufficiently severe or pervasive to show a hostile work environment.

1.   Severe

Based on the relevant caselaw, I conclude that the Post-It note incident, though vulgar and insulting, does not rise to a sufficient level of severity to show discrimination under Title VII or § 1981.

In McClean v. Communications Construction Group, LLC, 535 F. Supp.2d 485 (D. Del. 2008), two African American plaintiffs based their Title VII hostile work environment claim on a

single incident where a white supervisor called them "dumb niggers."  535 F. Supp.2d at 487-488.  The District Court for the District of Delaware ruled that the plaintiffs had failed to show a *prima facie* case for a hostile work environment, because " a single racially derogatory comment is insufficient to withstand defendant's summary judgment challenge."  Id. at 490.

Similarly, in Jones v. Norton, Civ. A. No. 06-2924, 2008 WL 282251 (E.D. Pa. Jan. 31, 2008), another Title VII case, the plaintiff pointed to a single altercation, during which a white co-worker called him a "black son of a bitch", a "black motherfucker" and possibly a "nigger" (Jones did not hear that word clearly).  The trial judge, however, granted summary judgment in favor of the defendant.

The judge in Jones wrote that, while the single incident to which Jones pointed "suggested a racial animus", a "single, racially charged, highly inappropriate outburst by a fellow employee" was insufficient to establish a hostile work environment.  Id. at *3.  The same must be said of Park's single, racially charged, highly inappropriate attempt at humor.  See, also, Lawrence v. F.C. Kerbeck & Sons, 134 Fed. Appx. 570, 572 (3d Cir. 2005) ("Although [the supervisor]'s alleged [racial] comment was disrespectful and inexcusable, we agree with the District Court that Lawrence cannot show a hostile work environment based on this one isolated incident").

In Killen v. Northwestern Human Services, Inc., Civ. A. No. 06-4100, 2007 WL 2684541 (E.D. Pa. Sep. 7, 2007), the Honorable Stewart Dalzell granted summary judgment in favor of the defendants where a plaintiff's hostile work environment claim depended on one incident in which the African American plaintiff was subjected to derogatory remarks about her dark skin tone from a lighter-skinned African American defendant.  Judge Dalzell wrote that, while a single incident can create a hostile work environment if it is sufficiently severe, the defendant's

alleged comments did not rise to a level of severity which could be said to alter the terms of the plaintiff's employment.  Id. at *6.

Judge Dalzell contrasted the plaintiff's claims in Killen, with Moring v. Arkansas Dep't of Corrections, 243 F.3d 452 (8th Cir. 2001), in which the Court of Appeals affirmed a jury's finding that a single incident created a hostile environment.  Judge Dalzell wrote:

> To put things in perspective, the allegations in Moring were as follows:  "Mr. Smith was Ms. Moring's supervisor.  They were on an overnight business trip.  He suggested that she might not be safe in her hotel room, or that they might be the object of animosity from the people at Calico Rock.  He knocked on Ms. Moring's door clothed only in boxer shorts.  After entering her room he repeatedly insisted that Ms. Moring 'owed' him for her job.  He would not leave the hotel room, although Ms. Moring repeatedly asked him to leave.  Finally, he sat on her bed, touched her thigh and leaned in as if to kiss her."  [Citing Moring].

Killen at *6.

Capilli has pointed to Nadeau v. Rainbow Rugs, Inc., 675 A.2d 973 (Me. 1996), where, as in Moring, a single incident was found to create a hostile work environment.  There, the plaintiff worked as an administrative assistant in the local Rainbow Rugs office, which was located in the home of her supervisor, Mr. Scola, the highest ranking Rainbow Rugs employee in the United States.  Id. at 974.  Scola's wife also worked in the office as the manager.  The company's directors resided in Belgium.  Id. at 975.

One month after Nadeau's husband abandoned her and their three children, Scola made a very specific offer that Nadeau should provide him with an ongoing sexual relationship in exchange for money.  Id. at 975.  He warned her to "act cold" in front of his wife.  Id.  When Nadeau rejected the proposal, Scola told her that her refusal would not jeopardize her position, but also asked her to tell him if she changed her mind.  Id.   The Supreme Judicial Court of

17

Maine concluded that this single incident created a hostile environment, given the "unique circumstances" of the case, which included her vulnerable circumstances, the fact that the workplace was in Scola's home, with his wife also present, and the fact that there was no superior to whom Nadeau could turn who was any closer than Belgium.  Id.

    None of the crucial factors in Moring and Nadeau is present here.  Park was a co-worker, not a supervisor.  He did not attempt to obtain sex, either for money or otherwise.  Capilli knew she could complain to Dean High or David Fisher, and she did so, even though she questions the adequacy of their responses.

    Further, in other cases courts have found that even several incidents, each as offensive as Park's note, were insufficient to create a hostile atmosphere.  Notably, in Saidu-Kamara v. Parkway Corporation, 155 F. Supp.2d 436 (E.D. Pa. 2001), the plaintiff's hostile work environment claim consisted of four incidents occurring over an 18-month period:

> Plaintiff first claims that in late 1994 or early 1995, Oluwole touched her breast, told her she looked "fresh", and propositioned her to join him later that evening. In the second incident several months later, Oluwole made several suggestive comments regarding Plaintiff's eyes and offered his financial assistance if Plaintiff would go out with him.  On a third occasion in the spring of 1995, Oluwole removed from his pants a large bottle of wine, offered Plaintiff a drink, and then asked her to join him later at a local hotel where they could have a "good time." The fourth incident occurred in December, 1995, when Oluwole, after complimenting Plaintiff on her good work, patted her on the buttocks and breast. Beyond these specific events, Plaintiff claims that Oluwole also made annoying or harassing comments about Plaintiff's refusal to take help from him, her family background, and her poverty.

Id. at 439-440.  [Internal citations omitted].

18

Nevertheless, the <u>Saidu-Kamara</u> judge granted summary judgment on the hostile environment claim, writing:  "While Oluwole's purported behavior is loathsome and inappropriate, Plaintiff has at best demonstrated sporadic and isolated incidents of harassment. The four specific incidents she cites occurred over nearly a year and a half."  <u>Id</u>. at 440.

Similarly, in <u>Barbosa v. Tribune Co.</u>, Civ. A. No. 01-1262, 2003 WL 22238984 (E.D. Pa. Sep. 25, 2003), a plaintiff pointed to seven specific instances of discrimination in an eighteen-month period, including three where he was called a "fucking spic."  <u>Id</u>. at *4.  The court decided that this did not demonstrate a hostile environment.  <u>Id</u>.  <u>See also</u> <u>King v. City of Philadelphia</u>, 66 Fed. Appx. 300, 302 and 305 (3d Cir. 2003) where "King's hostile work environment claim [was] based on [an] incident when he was subjected to a racial epithet by Officer Woltemate, and the evidence that Woltemate physically pushed and, on another occasion, threatened to sabotage his work record" but the Court of Appeals found that the incidents were "isolated and sporadic" and did not demonstrate a pervasive atmosphere of harassment.

This recitation of cases demonstrates that Park's Post-It note, while offensive, is not so severe as to result in a workplace permeated with discriminatory intimidation, ridicule or insult, as is required to show a hostile work environment.

2.    <u>Pervasive</u>

Since the Post-It note was a one-time occurrence, it would be very difficult for Capilli to demonstrate that it was pervasive.  As noted above, isolated incidents – unless extremely serious – will not amount to discrimination.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. at 788. In general, a plaintiff must show that she was subjected to "repeated, if not persistent acts of harassment."  <u>Harris v. SmithKline Beecham</u>, 27 F. Supp.2d 569, 578 (E.D. Pa. 1998).

Other that where a single incident *is* extremely serious (as discussed above), a single action can support a claim for hostile work environment harassment only if the action could reasonably be said to characterize the atmosphere in which the plaintiff works.  Harris v. SmithKline Beecham, 27 F. Supp.2d 569, 578 (E.D. Pa. 1998).  Capilli, however, has not shown that Park's Post-It note characterized an atmosphere hostile to Asians or to women.

Capilli has argued that Nicomatic discriminated against Asians.  She has raised an incident where a co-worker from India named Jostana was threatened by a white female co-employee who believed she was Muslim.  Capilli Deposition at 25; Fisher Deposition at 122-129.  It does not appear that Nicomatic disciplined the employee who made the threat.  Fisher Deposition at 128-129.  However, Fisher did call the local police.  Id. at 124.  Police officers came to Nicomatic and spoke to the threatening employee.  Id. at 122-125; Capilli Deposition at 63-64.  Therefore, this was hardly an example of Nicomatic fomenting, or ignoring, an anti-Asian atmosphere.  Moreover, in response to Nicomatic's motion for summary judgment, Capilli has not come forward with any statement or testimony from Jostana.

Capilli also testified that a co-worker named Steve, whose nationality she did not know, was unfairly disciplined for speaking to her during work time, although "the company's favorites" would not have been disciplined.  Capilli deposition at 73-76.  Steve, who might well be Asian, as his actual name is Gobardan Nandlal, may have been alluding in deposition excerpts provided by Nicomatic to anti-Asian bias, where he stated:  "there were certain things going on and I wasn't too happy" and "I was using other things that were happening to bolster my case."  Deposition of Gobardan (Steve) Nandlal, attached to Motion as Exhibit P at 15 and 19.  However, this is far from clear on these quotes.  Capilli has not provided additional deposition testimony to clarify this.

Moreover, as with Jostana, Capilli has not provided a statement from Nandlal or indicated what he might say as a trial witness.  Since Capilli's descriptions of things that happened to Jostana and Nandlal will be excluded as hearsay, it does not appear that Capilli would be able to show a jury any evidence of an anti-Asian atmosphere.

Because the discrimination faced by Capilli was not severe or pervasive, she will be unable to present at trial evidence to support her *prima facie* claim for hostile work environment discrimination.  Accordingly, summary judgment is warranted on her discrimination claim.

B.     Retaliation

1.     Comments Allegedly Made by David Fisher

Capilli has shown a *prima facie* case of retaliation respecting the comments allegedly made about her by David Fisher to James Strausbaugh.  Clearly, Capilli's complaint about the Post-It note, and her January 26, 2007, filing of an EEOC Charge of Discrimination were protected activity, even though I have concluded that she has not, ultimately, shown discrimination.

Further, Fisher's comments are clearly employer action, taken after Capilli's protected activity.  A finder of fact might conclude that a supervisor's trying to persuade a friendly co-worker that a complaint-filer was a liar, a troublemaker and crazy would dissuade a reasonable worker from pursuing her charge of a discrimination.  According to Capilli, she had Strausbaugh's statement by the time she filed her March 27, 2007, grievance.  Exhibit O to Motion.  Thus, she knew of the comments soon after they were allegedly made.  The fact that Fisher has denied at his deposition that he called Capilli a troublemaker is irrelevant, given that the jury might choose to credit Strausbaugh's version of events.

21

On these facts, it is not hard to infer that there was a causal connection between Capilli's protected activity and these statements.  If Capilli is successful at trial in proving that Fisher told Strausbaugh she was a liar and a troublemaker, the jury might well believe that he was, at least in part, referring to her allegations of sexual and national-origin discrimination.  Accordingly, summary judgment will be denied as to Capilli's claim of retaliatory remarks by Fisher.

2.   Discipline

Nevertheless, Capilli will not be able to show that the discipline she faced after submitting her written complaint of discrimination in January, 2007, was retaliatory, because she will not be able to show that there is a causal connection between her protected activity and the discipline.  The  discipline imposed upon her was proportionate to that received by other employees.  In fact, in two out of three cases, it was *identical* to the discipline received by other participants in the relevant incidents.

Following the March 21, 2007, incident, Park and Murphy were sent home for the day, as well as Capilli, and all four participants in the argument – Capilli, Park, Murphy and Strausbaugh – received written warnings.  Capilli's written warning was somewhat longer and more detailed than those of the others, but this is irrelevant since it did not result in any additional consequences. (Moreover, given that even Strausbaugh, who was supportive of Capilli, reported that she 'raised and quickly lowered' her arm to show Murphy a silver object, it was not discriminatory for Fisher to mention in Capilli's warning that she was accused of displaying a taser).

Both Capilli and Acuna received written warnings after the July 10, 2007, incident where Acuna's boyfriend apparently called Capilli a bitch.  Capilli's warning reflected that she also called Acuna a bitch, and that she entered into an argument with the boyfriend.

22

As for the April 27, 2007, warning for attendance problems, Capilli has not come forward with anything more than vague allegations that other Nicomatic employees were treated more leniently.  She testified at her deposition:  "Other people is taking off for a couple months and they don't get a warning for it, for taking vacation.  I take off for something emergency for my kids and I got harassed for that,"  but she has not provided any evidence supporting this statement.  Capilli Deposition at 111.

Nicomatic, on the other hand, has shown that Kris Skillman, who was not Asian, received an attendance warning on August 3, 2006, and a three-day suspension for attendance issues on September 13, 2006.  Employee Discipline, supra, attached to Motion as Exhibit M.  She received another warning on March 1, 2007, a month before Capilli was warned.  Id.  John Park, of the Post-It note incident, received attendance warnings on January 18 and February 15, 2007. Id.

A party opposing summary judgment must point to specific, affirmative evidence in the record and not simply rely on mere allegations, conclusory or vague statements, or general denials in the pleadings.  Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L. Ed.2d 265 (1986); Stiles v. Synchronoss Technologies, Inc. 2008 WL 3540483 at *3 (E.D. PA.,2008).  Capilli has not provided such specific, affirmative evidence of retaliatory discipline.

3.    Co-Worker Remarks

Moreover, Capilli cannot show that behavior directed towards her by co-workers constituted "employer action" as required to show a *prima facie* case of retaliation.  There is no evidence that she complained to Nicomatic about Park and Acuna laughing at her in the cafeteria, or remarks made by Santa, Kris Skillman, or Wendy Grendahl.  As noted above, co-worker

23

harassment is considered retaliatory only where supervisors knew or should have known about it, but failed to take prompt and adequate remedial action.  Moore v. City of Philadelphia, supra, at 497 F.3d 349.

As Nicomatic points out, Capilli's *prima facie* case cannot rely upon things Park said about Capilli that she only learned after he was deposed, such as that Capilli was a troublemaker or "full of crap."  Park Deposition at 31-32, 38.  Not only were these remarks not reported to Nicomatic, but remarks of which a plaintiff is unaware cannot dissuade her from making or supporting a charge of discrimination.

V.     Conclusion

Based on the foregoing discussion of the case, I now enter the following:

O R D E R

AND NOW, this     8th     day of September, 2008, upon consideration of Defendant's Motion for Summary Judgment, filed in this action as Document 20, Plaintiff's Response thereto, and Defendant's Reply, it is hereby ORDERED that the motion is GRANTED IN PART and DENIED IN PART:

1.  The motion is DENIED with respect to Capilli's allegations of retaliatory remarks made by David Fisher; and it is FURTHER ORDERED that

2.  The motion is GRANTED in all other respects.

BY THE COURT:

/s/Jacob P. Hart

_____

JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

24